Citation Nr: 1508816 
Decision Date: 02/27/15 Archive Date: 03/11/15

DOCKET NO. 07-28 927 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Milwaukee, Wisconsin


THE ISSUES

1. Entitlement to service connection for lung cancer, to include as due to exposure to herbicides and/or asbestos. 

2. Entitlement to a disability rating in excess of 30 percent for anxiety disorder for the period from April 27, 2005 to August 26, 2011, and to a disability rating greater than 70 percent thereafter. 

3. Entitlement to an effective date earlier than August 27, 2011 for the grant of a total rating based upon individual unemployability (TDIU) due to service-connected disabilities. 


REPRESENTATION

Veteran represented by: Robert V. Chisholm, Attorney


WITNESS AT HEARING ON APPEAL

The Veteran 


ATTORNEY FOR THE BOARD

D. Martz Ames, Counsel


INTRODUCTION


The Veteran had active service from October 1965 to October 1968.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from February 2006 and April 2013 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Milwaukee, Wisconsin. The February 2006 rating decision increased the Veteran's disability rating for anxiety disorder from 10 percent to 30 percent, effective April 27, 2005. 

The Veteran testified at a RO hearing in November 2007 and the transcript is of record. In his November 2008 VA Form 9, the Veteran requested a Board hearing. In June 2011, his representative stated that the Veteran was unable to attend the hearing and that he wished his appeal to be decided without one. Accordingly, the Board considers the Veteran's request for a hearing to be withdrawn and will proceed to adjudicate the case based on the evidence of record. See 38 C.F.R. §20.704 (d), (e) (2014).

In June 2011, the Board remanded this case to the RO via the Appeals Management Center (AMC) for further development. During the pendency of the appeal, a January 2012 rating decision granted a 70 percent rating for anxiety disorder, effective August 27, 2011. When a veteran seeks an increased evaluation, it will generally be presumed that the maximum benefit allowed by law and regulation is sought, and it follows that such a claim remains in controversy where less than the maximum benefit available is awarded. See AB v. Brown, 6 Vet. App. 35 (1993). The January 2012 rating decision also granted a TDIU effective August 27, 2011. 

In April 2012, the Board denied the Veteran's claim for an increased rating for anxiety disorder. The Veteran appealed his case to the U. S. Court of Appeals for Veterans Claims (Court), and in a December 2012 Order, the Court granted the parties' Joint Motion for Remand (Joint Motion), vacated the Board's April 2012 denial, and remanded the matter to the Board for development consistent with the Joint Motion. The parties specified that they did not contest the issue of entitlement to a disability rating in excess of 10 percent for anxiety disorder prior to April 27, 2005. 

The April 2013 rating decision denied service connection for lung cancer and the Veteran perfected his appeal of that issue while the issue of entitlement to an increased rating for anxiety disorder was in remand status. 

In June 2013, the Board again denied the Veteran's claim for an increased rating for an anxiety disorder. He appealed his case to the Court, and in a January 2014 Order, the Court granted the parties' Joint Motion and remanded this matter to the Board for further development.

In October 2014, the Board found that a TDIU claim had been raised by the record and remanded this case to the Agency of Original Jurisdiction (AOJ) for further development and it has now been returned to the Board. 

A review of the Virtual VA and Veterans Benefits Management System paperless claims processing systems reveal additional VA treatment records from January 2012 through April 2013 and from July 2014 to October 2014 that are pertinent to the present appeal. VBMS also includes documentation of the Veteran's perfected appeal of his claim for entitlement to service connection for lung cancer and the report of his October 2014 VA examination for lung cancer. In the November 2014 Statement of the Case (SOC) and Supplemental Statement of the Case (SSOC), the RO specifically stated that these records were reviewed prior to the adjudication of the claims. Accordingly, the Board finds no prejudice in proceeding with the present decision. Any future consideration of this case should take into consideration the existence of this electronic record.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 38 U.S.C.A. § 7107(a)(2) (West 2014).


FINDINGS OF FACT

1. The Veteran was not exposed to herbicides in service. 

2. The preponderance of the evidence reflects that the Veteran does not have lung cancer due to any incident of his active duty service, to include exposure to asbestos. 

3. It was factually ascertainable that the Veteran's service-connected disabilities precluded substantially gainful employment on April 27, 2005. 


CONCLUSIONS OF LAW

1. The Veteran's lung cancer was not incurred or aggravated in service, and may not be presumed to have been incurred or aggravated in service 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1116, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309 (2014). 

2. Beginning April 27, 2005, the criteria for a 70 percent disability rating for anxiety disorder were approximated. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1-4.14, 4.125, 4.130, Diagnostic Code 9400 (2014).

3. The criteria for a disability rating in excess of 70 percent for anxiety disorder have not been met during the appeal period. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1-4.14, 4.125, 4.130, Diagnostic Code 9400 (2014).

4. The criteria for an effective date of April 27, 2005, but no earlier, for the grant of a TDIU have been met. 38 U.S.C.A. §§ 5107(b), 5110 (West 2014); 38 C.F.R. §§ 3.155, 3.400 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duty to Notify and Assist

VA has met all statutory and regulatory notice and duty to assist provisions set forth in the Veterans Claims Assistance Act of 2000 (VCAA). 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.326(a) (2014). Prior to initial adjudication, letters dated in January 2006, February 2007, and January 2012 satisfied the duty to notify provisions with regard to the Veteran's claims. With regard to the duty to assist, the Veteran's service treatment records (STRs), VA medical treatment records, service personnel records, Social Security Administration records, and indicated private medical records have been obtained. A VA examination adequate for adjudication purposes was provided to the Veteran in connection with his claim for service connection for lung cancer in October 2014. See McLendon v. Nicholson, 20 Vet. App. 79 (2006); Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). The examination is adequate because it provided a description of the Veteran's pertinent medical history and a complete review of the record. The examiner also provided a rationale for the opinion. Barr, 21 Vet. App. at 312; Stefl v. Nicholson, 21 Vet. App. 120, 124-25 (2007). The Veteran underwent VA psychiatric examinations in February 2006, March 2008, and August 2011. The VA examinations are adequate because they are based upon consideration of the Veteran's pertinent medical history, his lay assertions and current complaints, and because they describe his anxiety disorder in detail sufficient to allow the Board to make a fully informed determination. Ardison v. Brown, 6 Vet. App. 405, 407 (1994).

With regard to the issue of entitlement to an earlier effective date for the grant of a TDIU, a retrospective medical opinion may be necessary and helpful in cases when the evidence is insufficient for an adequate determination. See Chotta v. Peake, 22 Vet. App. 80, 85 (2008). As will be discussed below, in this decision the Board grants an effective date of April 27, 2005 for the assignment of a TDIU because that is the date it was factually ascertainable that his anxiety disorder increased in severity. He filed his claim on December 23, 3005. Therefore, the remainder of the one year period (December 23, 2004 to April 26, 2005) must be examined. The available medical evidence in the present case, specifically, the Dr. J. M.'s opinion that the Veteran was unemployable since "before" April 2005 is sufficient for an adequate determination and there is no indication a retrospective VA medical opinion would be helpful in this case with regard to the period from December 23, 2004 to April 26, 2005.

As there is no indication that any failure on the part of VA to provide additional notice or assistance reasonably affects the outcome of this case, the Board finds that any such failure is harmless. See Mayfield v. Nicholson, 20 Vet. App. 537 (2006); see also Shinseki v. Sanders, 556 U. S. 396, 129 S. Ct. 1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination). Further, the purpose behind the notice requirement has been satisfied because the Veteran has been afforded a meaningful opportunity to participate effectively in the processing of his claims, to include the opportunity to present pertinent evidence. 

The Board is also satisfied that there was substantial compliance with its October 2014 remand directive, which directed the AOJ to review all new evidence in the Veteran's paper and electronic claims files, specifically including a June 2014 VA neuropsychological evaluation. This was accomplished in the November 2014 SSOC. See Stegall v. West, 11 Vet. App. 268 (1998); Dyment v. West, 13 Vet. App. 141, 146-47 (1999). 

II. Service Connection Claim 

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active military service. 38 U.S.C.A. § 1110 (West 2014); 38 C.F.R. § 3.303 (2014). If there is no showing of a resulting chronic condition during service, then a showing of continuity of symptomatology after service is required to support a finding of chronicity for certain diseases. 38 C.F.R. §§ 3.303(a),(b), 3.309(a) (2014); see also Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). Service connection may also be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2014). As "malignant tumors" is a chronic disease, 38 C.F.R. § 3.303(b) is potentially applicable in this case. 

In addition, for veterans with 90 days or more of active service during a war period or after December 31, 1946, the chronic diseases listed in 38 U.S.C.A. § 1101(3) and 38 C.F.R. § 3.309(a) , including malignant tumors, are presumed to have been incurred in service if they manifested to a compensable degree within one year of separation from service. 38 U.S.C.A. §§ 1101(3) , 1112(a)(1), 1113, 1137; 38 C.F.R. §§ 3.307(a) , 3.309(a).

For claims received by VA after June 9, 1998, a disability or death will not be considered service-connected on the basis that it resulted from injury or disease attributable to the Veteran's use of tobacco products during service. 38 C.F.R. § 3.300.

In order to establish service connection for the claimed disorder, there must be (1) medical evidence of a current disability; (2) medical, or in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical, or in certain circumstances, lay evidence of a nexus between the claimed in-service disease or injury and the current disability. See 38 C.F.R. § 3.303 (2014); see also Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004); Hickson v. West, 12 Vet. App. 247, 253 (1999); Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). The requirement of a current disability is "satisfied when a claimant has a disability at the time a claim for VA disability compensation is filed or during the pendency of that claim." See McClain v. Nicholson, 21 Vet. App. 319, 321 (2007). The standard is whether a disability exists at the time the claim was filed. See Romanowsky v. Shinseki, 26 Vet. App. 289, 293 (2013).

Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, all of the evidence submitted by the Veteran or on his behalf. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (finding that the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis herein focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claim. See Timberlake v. Gober, 14 Vet. App. 122 (2000) (holding that the law requires only that the Board address its reasons for rejecting evidence favorable to the Veteran). 

The Board must determine the value of all evidence submitted, including lay and medical evidence. Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006). The evaluation of evidence generally involves a three-step inquiry. First, the Board must determine whether the evidence comes from a "competent" source. The Board must then determine if the evidence is credible, or worthy of belief. Barr, 21 Vet. App. at 308. The third step of this inquiry requires the Board to weigh the probative value of the evidence in light of the entirety of the record. 

The standard of proof to be applied in decisions on claims for veterans' benefits is set forth in 38 U.S.C.A. § 5107 (West 2014). A claimant is entitled to the benefit of the doubt when there is an approximate balance of positive and negative evidence. See 38 C.F.R. § 3.102 (2014). When a claimant seeks benefits and the evidence is in relative equipoise, the claimant prevails. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990). The preponderance of the evidence must be against the claim for benefits to be denied. See Alemany v. Brown, 9 Vet. App. 518 (1996). 

The Veteran asserts that his lung cancer is the result of exposure to both herbicide and asbestos exposure in service. In his December 2011 claim, he asserted that his lung cancer was due to herbicide exposure. In his March 2014 Notice of Disagreement (NOD), the Veteran stated that he was exposed to asbestos while working as an interior communication electrician in the Navy. 

With respect to herbicide exposure, the Veteran served during the Vietnam Era. 38 C.F.R. § 3.2 (2014). However, the Veteran does not contend, and the evidence does not show, that he served in the Republic of Vietnam, including the waters offshore. Therefore, he is not presumed to have been exposed to herbicides. 38 C.F.R. § 3.307(a)(6)(iii) (2014). 

In January 2012, the RO sent the Veteran a letter informing him of ways by which he could show that he was exposed to herbicides, including providing information to allow the RO to contact the U. S. Army and Joint Service Records Research Center (JSRRC) to attempt to verify whether he was exposed to herbicides. The Veteran did not provide any information regarding how he was directly exposed to herbicides, including lay statement to support his claim. Further, his STRs and service personnel records do not reflect that he was exposed to herbicides. Therefore, there is no medical or lay evidence to support his claim that he was exposed to herbicides. The Board finds that the Veteran was not exposed to herbicides in service, and therefore presumptive service connection is not warranted for his lung cancer. 38 U.S.C.A. §§ 1101, 1112 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2014). 

With respect to claims involving asbestos exposure, VA must first determine whether military records demonstrate evidence of asbestos exposure during service and develop whether or not there was pre-service and/or post-service occupational or other asbestos exposure. In this case, the Board finds that working as an interior communications electrician aboard a ship could result in exposure to asbestos. 

Second, VA must determine whether there is a relationship between asbestos exposure and the claimed disease. VA Adjudication Procedure Manual, M21-1 MR, Part IV.ii.1.H.29; DVB Circular 21-88-8, Asbestos-Related Diseases (May 11, 1988). The inhalation of asbestos fibers can produce fibrosis and tumors, with interstitial pulmonary fibrosis (asbestosis) being the most common disease. A clinical diagnosis of asbestosis requires a history of exposure and radiographic evidence of parenchymal lung disease. Symptoms and signs include dyspnea, end-respiratory rales over the lower lobes, compensatory emphysema, clubbing of the fingers at the late stages; and pulmonary function impairment and cor pulmonale which can be demonstrated by instrumental methods. Asbestos fibers may also produce pleural effusions and fibrosis, pleural plaques, mesotheliomas of the pleura and peritoneum, lung cancer, and cancers of the gastrointestinal tract. Cancers of the larynx and pharynx, as well as the urogenital system (except the prostate) are also associated with asbestos exposure. Persons with asbestos exposure have an increased incidence of bronchial, lung, pharyngolaryngeal, gastrointestinal, and urogenital cancer. Moreover, the risk of developing bronchial cancer is increased in current cigarette smokers who have had asbestos exposure. 

The Veteran has been diagnosed with lung cancer, satisfying the first element of a service connection claim. Shedden, 381 F.3d at 1166-67. As noted above, the Board finds that he was exposed to asbestos in service, satisfying the second element of a service connection claim. Shedden, 381 F.3d at 1166-67. However, the nexus element of a service connection has not been satisfied for the reasons discussed below. 

In October 2014, the Veteran's claims file was provided to a VA examiner. The RO had requested a respiratory examination but the examiner felt that she could provide an opinion without a physical examination based upon the evidence of record. She noted that the Veteran had an incidental paratracheal lymph node mass in September 2010. In November 2010, he reported to the VA pulmonary clinic that he had been a cigarette smoker for 20 years, which means he started sometime after service. He was diagnosed with small cell lung cancer. The examiner noted that prior to his diagnosis of lung cancer, his chest x-rays were negative for any pulmonary findings suggestive of asbestos exposure, such as calcified pleural plaques or interstitial/parenchymal fibrosis. She also found that the CT and PET scans performed to diagnose lung cancer were also negative for any asbestos-related pulmonary disease. After completing chemo-radiation therapy for lung cancer in May 2011, his follow-up CT scans and chest x-rays were also negative for asbestos-related disease, including his most recent chest x-ray, which was taken in June 2014. 

The examiner concluded, "[s]ince [the Veteran's] chest radiographs prior to the diagnosis of his lung cancer in Nov[ember] 2010 and since then have been negative for any findings of asbestos related, it is therefore less likely as not that the [V]eteran's small cell lung cancer is related to conceded in-service asbestos exposure, but rather is more likely related to his years of t[o]bacco use." The Board finds the October 2014 examiner's opinion and rationale to be highly probative against the Veteran's claim. The examiner conducted a review of the record, including a discussion of multiple imaging studies and provided a well-reasoned rationale for her opinion. 

The only evidence in favor of the Veteran's claim is his lay opinion that his in-service asbestos exposure caused his lung cancer. Because there is no universal rule as to competence on this issue, the Board must determine on a case-by-case basis whether a particular condition is the type of condition that is within the competence of a lay person to provide an opinion as to etiology. See Jandreau v. Nicholson, 492 F.3d 1372, 1376 -77 (Fed. Cir. 2007); see also Kahana v. Shinseki, 24 Vet. App. 428, 433 n.4 (2011). Although lay persons are competent to provide opinions on some medical issues, see Kahana, 24 Vet. App. at 435, as to the specific issue in this case, the etiology of his lung cancer falls outside the realm of common knowledge of a lay person. See Jandreau, 492 F .3d at 1377 n.4. The Veteran does not possess the specialized experience necessary to examine imaging studies such as CT scans, chest x-rays, and PET scans to determine whether his lung disease was caused by asbestos exposure as opposed to other causes such as tobacco use. As a result, the persuasive value of his lay opinion is low because the overall factual picture is complex. Further, his assertion that exposure to asbestos caused his cancer has been investigated by competent medical examiner and found not supportable. Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). 

In this case, the Board finds that the findings of the October 2014 VA examiner are more probative than the Veteran's lay opinion. Therefore, service connection for lung cancer based upon asbestos exposure cannot be granted. 

Aside from herbicide and asbestos exposure, the Veteran has not asserted that any other disease or injury in service caused his lung cancer. His STRs are negative for any symptoms or diagnosis of a lung disability. There is no evidence of lung cancer within one year of service separation. The post-service medical and lay evidence does not show that the Veteran's lung cancer was caused by any other in service disease or injury. Therefore, the second and third elements of a service connection claim are not met with regard to direct service connection. Shedden, 381 F.3d at 1166-67.

In conclusion, the preponderance of the evidence is against the claim. Therefore, the provisions of 38 U. S. C. A. 5107(b) regarding reasonable doubt are not applicable. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2014); Alemany v. Brown, 9 Vet. App. 518, 519 (1996). The Veteran's claim for service connection for lung cancer is denied. 

II. Increased Rating Claim

Disability ratings are determined by applying the criteria established in VA's Schedule for Rating Disabilities, which is based upon the average impairment of earning capacity. Individual disabilities are assigned separate Diagnostic Codes. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.1, 4.20 (2014). When a question arises as to which of two ratings applies under a particular Diagnostic Code, the higher evaluation is assigned if the disability more nearly approximates the criteria for the higher rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2014). Consideration must be given to increased evaluations under other potentially applicable Diagnostic Codes. Schafrath v. Derwinski, 1 Vet. App. 589, 595 (1991). Furthermore, when it is not possible to separate the effects of the service-connected disability from a non service-connected condition, such signs and symptoms must be attributed to the service-connected disability. 38 C.F.R. § 3.102 (2014); Mittleider v. West, 11 Vet. App. 181, 182 (1998) (per curiam). After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the claimant. 38 C.F.R. § 4.3 (2014).

Staged ratings are appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505 (2007) (citing Fenderson v. West, 12 Vet. App. 119, 126 (1999)). Where entitlement to compensation already has been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). The Veteran's entire history is to be considered when making a disability determination. 38 C.F.R. § 4.1 (2014); Schafrath, 1 Vet. App. 589. 

The Veteran's anxiety disorder is rated under Diagnostic Code 9400. 38 C.F.R. § 4.130 (2014). Anxiety disorder is evaluated under the General Rating Formula for Mental Disorders. 38 C.F.R. § 4.130 (2014). The diagnostic criteria set forth in The American Psychiatric Association: Diagnostic And Statistical Manual Of Mental Disorders, (4th ed. 1994) (DSM- IV) for mental disorders have been adopted by the VA. 38 C.F.R. § 4.125 (2014). 

Under the General Rating Formula for Mental Disorders, a 30 percent rating is warranted when there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 38 C.F.R. § 4.130 (2014). 

A 50 percent rating is assigned when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id. 

A 70 percent rating is assigned for occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, thinking or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. Id. 

A 100 percent rating is assigned for total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent ability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name. Id. 

Symptoms listed in the General Rating Formula for Mental Disorders are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). A veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (Fed. Cir. 2013). Additionally, while symptomatology should be the primary focus when deciding entitlement to a given disability rating, § 4.130 requires not only the presence of certain symptoms but also that those symptoms have caused the requisite occupational and social impairment. Id.

The DSM-IV contains a Global Assessment of Functioning (GAF) scale, with scores ranging between zero and 100 percent, representing the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health-illness. Higher scores correspond to better functioning of the individual. During the appeal period, the Veteran's GAF scores ranged from 48 at worst, to 60 at best. 

Under the DSM-IV, GAF scores ranging between 51 and 60 are assigned when there are moderate symptoms (like flat affect and circumstantial speech, and occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). 

GAF scores ranging between 41 and 50 are assigned when there are serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). 

It is important to note that a GAF score is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing DSM-IV at 32). A GAF score is highly probative because it relates directly to the Veteran's level of impairment and social and industrial adaptability. Massey v. Brown, 7 Vet. App. 204, 207 (1994). Although GAF scores are important in evaluating mental disorders, the Board must consider all the pertinent evidence of record and set forth a decision based on the totality of the evidence. See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995).

For the period from April 27, 2005 to August 26, 2011, the Veteran's anxiety disorder is assigned a 30 percent rating under Diagnostic Code 9400. 38 C.F.R. §§ 4.125, 4.130 (2014). Affording the Veteran the benefit of the doubt, the Board finds that the evidence of record shows that the Veteran's psychiatric symptoms were more closely approximated by the 70 percent criteria for the period from April 27, 2005 to August 26, 2011. 38 C.F.R. § 4.7 (2014). 

However, for the reasons discussed below, the Board finds that an 100 percent rating is not warranted for the entire appeal period because the Veteran's symptoms are not of the frequency, severity, or duration to more closely approximate the 100 percent criteria. Vazquez-Claudio, 713 F.3d 112. 

With regard to mood, the Veteran experiences depression and anxiety. However, his description of these symptoms is variable. His VA treatment records show that he consistently reports depressed and anxious mood but of varying severity. For example, at his February 2006 VA examination he stated that he felt "mostly down and crabby," and that he had become "more anxious." In September 2008, he stated that he felt anxious "all the time." At his August 2011 VA examination he reported depressed mood. In June 2014 Dr. J. M. found that his depression and anxiety were quite severe.

However, he also reported periods where he felt better. Specifically, he described instances of feeling less depressed or not depressed at all. For instance, in October 2005 his mood was described as "more relaxed," his affect was "brighter," and he was sleeping well. In January 2006 he reported anxiety only "at times." In October 2006 his depression was noted to be "stable," and in January 2007 he was doing "fairly well," and felt "optimistic." The health care provider stated that there was "[n] evidence of current depression." In March 2007, the Veteran reported feeling depressed or sad much of the time in the past year. In October 207 he felt "a bit more down." In March 2008 his mood was "improved since last visit," and "stable." In August 2008 he was "mildly depressed" and under stress due to family problems. In September 2008, he reported feeling more depressed. Later in September 2008, he felt "fine." In November 2008 he described being in a "pretty good mood," but later in November 2008 he felt more down. In January 2009, he felt "alright" and his mood was euthymic. In April 2009 he felt "somewhat" down. In April 2010 "some improvement" in his mood was noted but the Veteran also reported feeling depressed. In August 2010, his mood was "much better," and in November 2010 he reported being depressed "at times." In August 2011 he was "mildly" depressed. In April 2013 he reported being in a good mood, and it was noted that he denied symptoms of depression, anxiety, and irritability. He stated, "I feel better." In July 2013 he stated, "I feel good," and his mood was euthymic. At a June 2014 neuropsychological examination, he stated that his mood was "good," and the health care provider noted that the Veteran "...denied feeling depressed or anxious," but had mood swings, anxiety, and being quick to anger. 

His private medical records also show depressed and anxious mood. In June 2009, he reported depression and anhedonia to Dr. J. K., a private psychologist who diagnosed major depressive disorder. In June 2014, Dr. J. M. found that the Veteran had "very severe" depression according to the Beck Depression Inventory and "extremely elevated" anxiety according to the Beck Anxiety Inventory. Dr. J. M. noted that the Veteran displayed symptoms of panic disorder with agoraphobia, major depression, and generalized anxiety disorder. 

The Veteran's depression and anxiety varied in severity. However, they are not severe enough to cause total occupational and social impairment. During the appeal period he has described mood disturbances that wax and wane, to the point where on some occasions he denied symptoms of depression entirely. Although Dr. J. M. believed that the Veteran tended to underreport the severity of his symptoms, the evidence of record as a whole does not support a finding that the Veteran's mood disturbance causes total occupational and social impairment. 

With regard to suicidal and homicidal ideation, the Veteran reported "intermittent" suicidal and homicidal ideation at his February 2006 VA examination but did not have an intent to follow through with his thoughts. The February 2006 VA treatment record was the only instance of the Veteran admitting to homicidal ideation. In March 2007 he stated that his physical pain "...has made him think about suicide at times," but he had no plan to follow through and at the time of his appointment did not have current suicidal ideation. In August 2008 he admitted to "occasional" suicidal ideation. In June 2009, he reported to Dr. J. K that he had occasional suicidal ideation. In November 2009, he had "passive" suicidal ideation. At a June 2014 VA neuropsychological assessment, it was noted that in April 2014, the Veteran presented with suicidal ideation "in response to his delusion of bugs infesting and laying eggs in his skin, which he said was no longer present during the hospitalization." At his June 2014 evaluation with Dr. J. M., the Veteran denied suicidal ideation, but it was noted that the Veteran had made threats of suicide in the past and was "probably at risk," and that he presented as the type of person who may not be forthcoming about suicidal intent or plan. The Veteran denied both suicidal and homicidal ideation at numerous VA treatment appointments. Although the Veteran experiences intermittent suicidal ideation, he has not made an active attempt and has consistently denied intent or plan to follow through with his ideation. Therefore, his suicidal ideation is of the frequency, severity, and duration that is more closely approximated by the 70 percent criteria, which contemplates occupational and social impairment with deficiencies in most areas. His suicidal ideation does not cause total occupational and social impairment. 

The Veteran did not experience auditory or visual hallucinations during the entire appeal period. In October 2007, a VA health care provider stated that the Veteran's belief that injections received in service caused disabilities "...almost seems delusional." Further, he endorsed one explicitly delusional belief beginning in April 2014 when he was hospitalized, but no longer endorsed it when his hospitalization ended. He believed that bugs were laying eggs under his skin and used cigarettes to burn them away. He endorsed this delusion again in June 2014 and July 2014. Experiencing a delusion for a period of less than one year during the entire appeal period does not more closely approximate a description of "persistent." Further, aside from these instances, the Veteran's treatment records find that he did not experience delusions at all. The Veteran's belief that bugs infest his skin is not of the level of frequency, severity, or duration sufficient to be more accurately described as causing total occupational and social impairment. 

The Veteran has endorsed symptoms of impaired memory, ability to concentrate, and other cognitive dysfunction. For example, in March 2007, the Veteran's wife stated that the Veteran had poor memory. At his August 2011 VA examination, he was found to have mild memory loss when compared with testing conducted in 2008. The examiner concluded that it was consistent with a decline caused by chemotherapy and radiation treatment as opposed to his service-connected anxiety disorder. 

There are two pieces of conflicting evidence regarding the cause of the Veteran's cognitive decline. In June 2014, Dr. J. M. stated that the Veteran "had difficulty answering questions about his mental health history and this may be significant and probably goes to the issue of his problems with comprehension." He was difficult to understand and had slurred speech. He had low energy and problems with concentration, focus, and remembering tasks. At the examination, he lost track of his thoughts and could not remember the beginning of sentences. Dr. J. M. stated that, "[i]t is questionable if [the Veteran] possesses basic communication and social skills." He had problems understanding questions and providing coherent answers. He watched television but could not recall the content of the programs he watched. Dr. J. M stated that the Veteran's thoughts were slow "at times" and "only marginally connected." His flow of speech was fragmented, suggesting some problems with cognition. His psychomotor activity was slowed and possible retarded. 

Dr. J. M. stated that the Veteran's testing indicated that the Veteran was "uneasy" in social situations, had low empathy and problems relating to other people. He also had "some" problems with responsibility. It was noted that he was "easily affected by feelings and emotionally less stable" and that he was "sometimes" careless of social rules. He was tense, frustrated, apprehensive, self-blaming, prone to worry, suspicious, distrustful, and skeptical. He also was fond to have poor social adjustment. However, he faired better in ability to relate to his family, poorly in occupational relations, and "somewhat" better in community relations. His family and community relations were "within the norm." 

Dr. J. M. stated that the Veteran presented with a "tough mental exterior" and this made him have difficulty admitting that he had psychiatric problems. His wife stated that he underreported symptoms. Dr. J. M. attributed the Veteran's denial of depressive symptoms to his "tough mental exterior." Although the Board finds Dr. J. M.'s assessment persuasive with regard to his own interview with the Veteran, it is not persuasive with regard to the other instances of record. Dr. J. M. was not present during the instances where the Veteran denied certain symptoms and therefore he is less capable of making such an observation compared with the person who was examining the Veteran directly at the time. 

Dr. J. M. asked the Veteran's wife if he had ever had a stroke. His wife indicated that there were concerns he "possibly" had a stroke because of his change in behavior and speech. She stated that he was scheduled to undergo a neuropsychological examination at VA later that month and Dr. J. M. noted that "[t]hese findings could prove very significant." Dr. J. M. also speculated that the Veteran might have "possible early onset of some type of cognition disorder, possibly some form of dementia." 

After his examination with Dr. J. M., the Veteran underwent a VA neuropsychological assessment in June 2014. He endorsed a delusion that bugs were eating his legs. He described his memory as "pretty good," but that he forgot items, got lost in familiar places, and forgot the day of the week. He stated that he had problems getting his point across to others. He stated that he lost his train of though and had problems following through with and completing tasks. He stated that he made poor decisions. He denied problems carrying out his activities of daily living (ADLs) or managing his finances. He described his mood as "good" and he "denied feeling depressed or anxious." 

Upon examination, he had cigarette burns from trying to remove bugs that he believed were in his legs. Otherwise he was properly groomed. His posture was slumped and his right hand had a resting tremor. His conversational speech was normal in prosody but slow in rate, slightly dysarthric, and hypophonic. His thought processes were slow and tangential. He had "poor" insight. He could not identify the date or the name of the previous President. His ability to pay attention was "generally impaired," and his memory scores were "inconsistent." 

The neuropsychologist reviewed imaging studies of the Veteran's brain. An October 2009 CT scan showed "a right cerebellar small old lacunar infarct." An August 2012 CT scan showed a "nonspecific hypo attenuating chronic small vessel ischemic change and/or hypertension." An April 2014 MRI scan showed "diffuse parenchymal volume loss, ventricular prominence increased due to ventricular ectasia, periventricular and subcortical high T2 signal (most likely due to chronic microvascular ischemic disease), and an unchanged small old infarct within the right cerebellum." 

The neuropsychologist found that the Veteran's "scores on measures of intellectual functioning suggest decline from his premorbid level of intelligence." Further, she noted that the Veteran "...did not report feeling depressed during the interview or on a psychological measure; thus, his current cognitive performance is likely not due to major depressive disorder with psychotic features (one of the differential diagnoses suggested during his prior hospitalization)." The neuropsychologist concluded that the Veteran's symptoms met "...the criteria for Mild Cognitive Impairment, multiple domain subtype, the etiology of which is likely due to his daily alcohol use, frequent marijuana use, and cerebrovascular changes...Finally, these cognitive difficulties are likely exacerbated by his chronic pain." In a December 2014 addendum, Dr. J.M. noted that he was adding poly-substance abuse as a diagnosis and that it was a form of self-medication. 

Dr. J. M. was unable to attribute the Veteran's cognitive problems to his psychiatric disability or a possible stroke. Subsequently, the June 2014 neuropsychological examiner concluded that his cognitive impairment was not a result of his service-connected psychiatric disorder and instead was related to other factors. The June 2014 neuropsychologist reviewed multiple imaging studies, thoroughly examined, tested, and interviewed the Veteran, and provided an alternative cause of his cognitive symptoms. The Board finds that that June 2014 VA neuropsychological assessment provides the most probative evidence regarding the source of the Veteran's cognitive impairment. Therefore, because it is possible to separate his cognitive symptoms from his service-connected disability, his cognitive impairments are not considered as part of his disability rating for his psychiatric disorder. 38 C.F.R. § 3.102 (2013); Mittleider, 11 Vet. App. at 182. Further, even if they were considered to be part of his service-connected disability picture, they do not cause total occupational and social impairment based upon his ability to function independently. 

The evidence of record shows that at worst, the Veteran had some difficulty remaining motivated to complete his ADLs. For example, Dr. J. M. noted in June 2014 that the Veteran was able to dress himself but that his wife had to "push him at times." He attempted to do some household chores, used the microwave, made sandwiches, but had low motivation and energy. He was able to drive short distances, use a telephone, and make "very simple" routine purchases. At his June 2014 VA neuropsychological assessment the Veteran denied problems completing his ADLs. 

Although the Veteran is severely occupationally impaired, he does not have total social impairment to satisfy the 100 percent criteria. He has been married for many years and even though his marriage has endured periods of stress and discord, he has not divorced. For many years he, together with his wife, cared for multiple foster children. They permanently adopted one of their foster children. The record shows that he sometimes isolates himself from society and his family. However, he also reported some recreational activities such as playing pool, playing video games, reading science fiction, and working on computers. His wife stated that he attended church once a month. His level of social impairment is more closely approximated by the 70 percent criteria, which contemplates occupational and social impairment with deficiencies in most areas. 

Although the Veteran's insight was found to be "poor" in June 2014 and "fair to poor" in July 2014, his insight and judgment have otherwise consistently been found to be fair or good. His impairment of judgment or insight is more closely approximated by the 70 percent criteria because it is not of the frequency, severity, or duration needed to more closely approximate the 100 percent criteria. 

Lastly, the Veteran's GAF score was, at worst, a range of 48-52 in March 2011. As noted above, a GAF score of 48 indicates serious symptoms, or any serious impairment in social, occupational, or school functioning." A GAF score of 48 is more closely approximated by the 70 percent criteria, which specifically contemplate occupational and social impairment with deficiencies in most areas. Further, the majority of the Veteran's GAF scores were 51 or above, indicating only moderate symptoms or moderate difficulty in social, occupational, or school functioning. 

For these reasons, the Board finds that the Veteran's psychiatric symptoms are not more closely approximated by the 100 percent criteria. 

In summary, a 70 percent rating is granted from April 27, 2005. To this extent, the appeal is granted. However, reviewing the evidence, the Board finds that the overall disability picture for the Veteran's anxiety does not more closely approximate a 100 percent rating under the applicable Diagnostic Code. 38 C.F.R. § 4.7 (2014). Therefore, the preponderance of the evidence is against this claim, and it must be denied. 38 C.F.R. § 4.3 (2014). The Veteran's symptoms from his anxiety disorder have not met the criteria for a 100 rating at any time since April 27, 2005, so the Board may not stage his rating. Fenderson, 12 Vet. App. at 125-26. 

There is no evidence of exceptional or unusual circumstances to warrant remand to refer this claim for extraschedular consideration. 38 C.F.R. § 3.321(b)(1) (2014). The threshold factor for extraschedular consideration is a finding that the evidence presents such an exceptional disability picture that the available schedular evaluations for the service-connected disability at issue are inadequate. Therefore, there must be a comparison between the level of severity and the symptomatology of the Veteran's disability with the established criteria provided in the rating schedule for the disability. If the criteria reasonably describe the Veteran's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is adequate, and no referral to the Director of the Compensation Service for consideration of an extraschedular rating is required. Thun v. Peake, 22 Vet. App. 111 (2008), aff'd, Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009).

As described above, the manifestations of the Veteran's anxiety disorder are contemplated by the schedular criteria General Rating Formula for Mental Disorders. As noted above, the symptoms in this formula are not an exhaustive list, and the Board has considered the types of symptoms the Veteran has and whether they are of the frequency, severity, and duration needed to be more closely described by the 100 percent rating. Mauerhan, 16 Vet. App. 436; Vazquez-Claudio v. Shinseki, 713 F.3d 112. The criteria practicably represent the average impairment in earning capacity resulting from the Veteran's service-connected anxiety disorder, such that he is adequately compensated for "considerable loss of working time ...proportionate to the severity of the several grades of disability." See 38 C.F.R.§ 4.1 (2014). Further, no examiner has reported an exceptional disability picture with symptoms not represented in the rating schedule. In sum, there is no indication that the average industrial impairment from the disability would be in excess of that contemplated by the assigned rating. Accordingly, the Board has determined that remand for referral of this case for extraschedular consideration is not in order. 

Finally, the Board notes that under Johnson v. McDonald, 762 F. 3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected symptoms experienced. However, in this case, after applying the benefit of the doubt under Mittleider v. West, 11 Vet. App. 181 (1998), there are no additional service-connected symptoms that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple service-connected conditions. 

III. Earlier Effective Date for the Grant of a TDIU

Total disability is considered to exist when there is any impairment which is sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. § 3.340(a)(1) (2014). A total disability rating for compensation purposes may be assigned on the basis of individual unemployability: that is, when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities. In such an instance, if there is only one service-connected disability, it must be rated at 60 percent or more; if there are two or more service-connected disabilities, at least one disability must be rated at 40 percent or more, and sufficient additional disability must bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16(a) (2014). Individual unemployability must be determined without regard to any non service-connected disabilities or the Veteran's advancing age. 38 C.F.R. §§ 3.341(a), 4.19 (2013); Van Hoose v. Brown, 4 Vet. App. 361 (1993).

In its January 2012 rating decision, the AMC granted a TDIU effective August 27, 2011, the date that the criteria set forth in C.F.R. § 4.16(a) were first met. 

Because the Board has granted a 70 percent disability rating for the Veteran's anxiety disorder effective April 27, 2005, the criteria set forth in 38 C.F.R. § 4.16(a) were met as of that date. 

A claim for a TDIU is a claim for an increased rating. Dalton v. Nicholson, 21 Vet. App. 23, 31-32 (2007); see also Hurd v. West, 13 Vet. App. 449, 451-52 (2000); Norris v. West, 12 Vet. App. 413, 420 (1999). The effective date of the award of an evaluation based on an original claim, a claim reopened after a final disallowance, or a claim for an increase will be the date of receipt of the claim or the date entitlement arose, whichever is later. 38 U.S.C.A. § 5110(a) (West 2002); 38 C.F.R. § 3.400(b)(2)(ii) (2014). 

The Veteran filed his claim for an increased disability rating for his anxiety disorder on December 23, 2005 and filed a formal claim for a TDIU on December 22, 2006. In its October 2014 remand, the Board found that a TDIU claim had been raised. Rice v. Shinseki, 22 Vet. App. 447, 453-54 (2009). In light of the assertions regarding unemployability in 2005, a claim for TDIU is considered analogous to an increased rating claim. See Hurd v. West, 13 Vet. App. 449 (2000) (holding that a claim for TDIU is a claim for increased compensation and the effective date rules for increased compensation apply to a claim for TDIU). Thus, the effective date of TDIU is generally determined in accordance with the laws and regulations governing effective dates of increased ratings. 

Where a claim for TDIU stems from an initial disability rating, the service-connection earlier effective date regulation ought to apply by analogy. See Rice v. Shinseki, 22 Vet. App. 449, 456 (2009) (explaining that Hurd v. West, 13 Vet. App. 449 (2000) does not stand for the proposition that an assertion of entitlement to TDIU is always a claim for increased compensation, and because the Court found that TDIU in this case was on direct appeal as part of the initial disability rating it was error for the Board to apply 38 U.S.C.A. § 5110(b)(2) and 38 C.F.R. § 3.400(o)(1)). Except as otherwise provided, the effective date of an evaluation and award of pension, compensation, or dependency and indemnity compensation based on an original claim, a claim reopened after final disallowance, or a claim for increase will be the date of receipt of the claim, or the date entitlement arose, whichever is later. 38 U.S.C.A. § 5110(a) (2014); 38 C.F.R. § 3.400 (2014). In this case, the Veteran's TDIU claim has been pending as part and parcel of the December 23, 2005 claim for an increased disability rating for anxiety disorder, not from an initial disability rating. 

For an increased rating claim, an effective date may be the earliest date of which it is factually ascertainable that an increase in disability had occurred if a claim is received within one year of such a date. 38 C.F.R. § 3.400(o)(2) (2014). In this case, the RO granted a 30 percent disability rating for anxiety disorder based upon an April 27, 2005 VA treatment report noting a problem with motivation and task completion. He also reported chronic stress and he was prescribed additional medication for control of his symptoms. The Board agrees with the RO that April 27, 2005 is the date that it was factually ascertainable that an increase in disability occurred. The Veteran filed his claim within one year of April 27, 2005. Therefore, an effective date of April 27, 2005 is appropriate. The evidence of record during the remainder of the one year prior to December 23, 2005 does not reflect an increase in disability. Further, the Veteran chose not to challenge the effective date of the grant of a 30 percent rating, indicating that he did not believe such an increase in severity had occurred prior to that date. 

In June 2014, Dr. J. M. stated that the Veteran has been unemployable because of his anxiety disorder since "before" April 2005. There is no evidence showing that the Veteran's service-connected disabilities do not preclude substantially gainful employment. Therefore, an effective date of April 27, 2005 for the grant of a TDIU is granted. 

The Board finds that an effective date prior to April 27, 2005 is not warranted for the grant of a TDIU because the Veteran filed his claim for an increased rating for his anxiety disorder on December 23, 2005 and it was not factually ascertainable that his service-connected disabilities precluded substantially gainful employment during the period from December 23, 2004 to April 26, 2005. 

The Board acknowledges that for the period from December 23, 2004 to April 26, 2005, the criteria set forth in 38 C.F.R. § 4.16(a) were not met. If a Veteran does not meet the applicable percentage standards set forth in 38 C.F.R. § 4.16(a) , the issue of entitlement to a TDIU may be submitted to the Director, Compensation Service, for extraschedular consideration where the Veteran is unable to secure or follow a substantially gainful occupation by reason of service-connected disability. 38 C.F.R. § 4.16(b) (2014); Fanning v. Brown, 4 Vet. App. 225 (1993). In this case, remand for referral to the Compensation Service for consideration of an extraschedular TDIU is not warranted. The medical and lay evidence of record for this approximately five month period of time does not show that the Veteran's service-connected disabilities precluded substantially gainful employment. They showed that he was not working, but did not support the conclusion that he was precluded from substantially gainful employment as a result of his service-connected disabilities alone. 

Lastly, there are no pending claims for TDIU that have not already been implicitly denied, nor has the Veteran so contended. 

The Veteran filed a claim for non service-connected pension on a VA Form 21-527 on February 28, 2000. In a statement accompanying his claim, the Veteran stated that he worked for Unisys from December 1998 to May 1999 and had been unemployed since that time. On his VA Form 21-527 he stated that the illness he had in the past 12 months was necrosis of the hip, a non service-connected disability. That claim was denied in a July 2000 rating decision. The Veteran filed an NOD in August 2000. He stated that he had a combined 80 percent evaluation for the purposes of non service-conencted pension and because of that, he was unable to work. However, the Veteran was referring to all of his disabilities, both service-connected and non service-connected. The RO granted non service-connected pension in a December 2000 rating decision. 

The February 28, 2000 non service-connected pension claim did not satisfy the "identify the benefit sought" requirement of a claim with regard to an increased rating and was therefore not an increased rating or TDIU claim. 38 C.F.R. § 3.155(a) (2014); Roberson v. Principi, 251 F.3d 1378, 1384 (Fed. Cir. 2001).

The Veteran filed a claim for an increased disability rating for his anxiety disorder that was received on December 13, 2000. However, he did not assert that he was unable to work or submit evidence of unemployability with his increased rating claim. His claim stated that, "[h]e feels this condition has worsened. He does not have any medical evidence to submit or report." Therefore, it is not considered a TDIU claim. Id. 

He did not file additional increased rating claims between December 2000 and December 2005, nor has he so asserted. The Board finds that there was is no TDIU claim pending prior to December 23, 2005 for a TDIU. 

In conclusion, an effective date of April 27, 2005, but no earlier, is granted for the assignment of a TDIU. 


ORDER

Entitlement to service connection for lung cancer is denied. 

A 70 percent disability rating for anxiety disorder is granted, effective April 27, 2005. 

A disability rating in excess of 70 percent for anxiety disorder is denied. 

An effective date of April 27, 2005 is granted for the assignment of a TDIU. 



____________________________________________
K. PARAKKAL
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs